EBEL, Circuit Judge.
Jaime Ceballos's wife, Quianna Vigil, called police on an August evening in 2013 to report that her husband was in their *1209 driveway with a baseball bat "acting crazy," and that he was drunk and probably on drugs. Vigil further reported that she was afraid and had left the house with their seventeen-month-old; Vigil wanted police to remove Ceballos so she could return home to put the child to bed. Defendant William Husk and several other Thornton police officers responded. Within a minute of their arrival, Officer Husk shot Ceballos to death in the street in front of his home. Ceballos's estate (also referenced herein as "Ceballos") and his surviving wife and children initiated this litigation against Officer Husk and the City of Thornton. Relevant here, Plaintiffs assert three claims: 1) a 42 U.S.C. § 1983 claim against Officer Husk, alleging he used excessive force in violation of the Fourth Amendment; 2) a § 1983 claim alleging the City failed to train Officer Husk adequately in how to handle situations involving individuals who are emotionally distraught or who have a diminished ability to reason; and 3) a state-law wrongful death tort claim against Husk. In this interlocutory appeal, Defendants challenge the district court's decision to deny them summary judgment on each of these three claims. We AFFIRM the district court's decision denying Officer Husk summary judgment on the § 1983 excessive-force claim. We DISMISS for lack of jurisdiction both the City's appeal from the denial of summary judgment on the § 1983 failure-to-train claim as well as Husk's appeal involving the state-law wrongful death claim.
I. BACKGROUND
As the district court indicated throughout its decision, there remain numerous disputed issues of material fact underlying the claims at issue in this case. But in this interlocutory appeal from the denial of summary judgment premised in part on Officer Husk's assertion of qualified immunity, we "take as given the district court's assessment of what facts a reasonable jury could accept at trial," in light of the summary-judgment record. Walton v. Powell, 821 F.3d 1204, 1208 (10th Cir. 2016) (applying Johnson v. Jones, 515 U.S. 304, 317, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ). Further, we "view the facts in the light most favorable to the non-moving part[ies] and resolve all factual disputes and reasonable inferences in [their] favor." Knopf v. Williams, 884 F.3d 939, 946 (10th Cir. 2018) (internal quotation marks omitted).
A. The shooting
Ceballos's wife called 911 at 7:30 p.m. on August 30, 2013, reporting, among other things, that her husband was in the driveway of their home "with two [baseball] bats and acting crazy; that she was afraid and had her 17-month old daughter with her; that Ceballos was drunk and probably on drugs; and that two of Ceballos' friends were with him." (Aplt. App. 707.) The 911 dispatcher issued a radio call regarding "a high priority disturbance involving a party armed with one or more bats, describing it as a 'DK [drunk] unwanted party' and a 'disturbance.' " (Id. ) The dispatcher also indicated that Ceballos "is known to have knives." (Id. 214.) "Radio traffic" further reported that Ceballos had been a " 'walkaway' from [a nearby medical center] the previous night." (Id. 707.)
The dispatcher sent officers further information about the situation over the "Computer-Aided Dispatch (CAD) system" (id. 707)-including information that Ceballos had threatened his wife with a knife several months earlier and that he was not taking his anti-depression medication. Husk, however, did not look at the CAD.
Husk arrived on scene at the same time as Officer Ward. Because the call occurred in his district, Husk took charge. The two officers
parked near the vehicle in which [Quianna] Vigil had parked with her daughter, *1210 several houses down the street from the driveway where Ceballos was located. The officers spoke to Vigil and identified her as the reporting caller, and then began to walk toward Ceballos. As Officers Ward and Husk walked toward the residence, two men who had been with Ceballos, Andrew Castillo and Sergio Martinez, approached and told officers that Ceballos was not acting right and might be on drugs. Castillo and Martinez say that the officers refused to take additional information from them and continued to advance toward Ceballos. Castillo says he was told to "shut the fuck up" and "get back."
(Id. 707-08.)
At that time, two other officers arrived in separate cars; Commander Carbone parked near Husk's and Ward's patrol cars, while Officer Snook parked on the other side of Ceballos's home and began approaching Ceballos from the opposite direction as Husk and Ward. Officer Snook then decided to return to his vehicle to get a beanbag shotgun, which is non-lethal and can be fired at a greater distance than a Taser. Snook testified in his deposition
that he recognized Ceballos from the walkaway incident the night before, and thought from observing him in the driveway that something in his face "didn't seem right." When Snook turned [to his patrol car] to get his [beanbag] shotgun, he did not think that either his own life or the lives of the other officers were in danger given their respective distances from Ceballos and that he was armed with a baseball bat.
(Id. 709-10.)
Not waiting for Officer Snook to return with the beanbag gun, Officers Husk and Ward continued to approach Ceballos. When they "were approximately 100 yards from the [Ceballos] residence, they saw Ceballos pacing in the driveway, swinging a baseball bat, yelling and throwing his arms in the air." (Id. 708.) There was no one else in the driveway with Ceballos. "By this time, the officers knew that [Ceballos's wife] and her daughter were parked down the street from Ceballos and that Ceballos' two friends had also left his immediate vicinity." (Id. ) Furthermore, the officers "did not see any neighbors or other members of the public."[1] (Id. )
Officers Husk and Ward walked in the middle of the street toward Ceballos to keep a clear line of sight. They both repeatedly shouted commands for Ceballos to drop the bat. Instead of doing so, he went into his garage. Either before or after Ceballos went into the garage, Officer Husk drew his firearm and Officer Ward drew his less lethal taser. Ceballos emerged from the garage with the bat in his hand and began walking toward the officers, who had their weapons drawn and continued shouting commands. The evidence is conflicting as to whether Ceballos was walking quickly or slowly toward the officers and whether Officers Husk and Ward continued to advance toward Ceballos or stopped their approach to give him an opportunity to comply with their commands. It is undisputed that he did not comply with their commands, instead responding with comments such as "Fuck you!" and "Or what, Motherfucker?" Officer Husk says he replied, "Or you will be shot," and continued to order him to stop and drop the bat. Officers Husk and Ward have testified that they did not retreat from Ceballos because, in accordance *1211 with their training, they wanted to try to contain him and prevent him from running away and endangering the public. They also say they were in fear for their lives.
At some point Officer Ward fired his taser, but again the evidence is conflicting.... From this conflicting evidence a jury could infer that Officer Husk fired his gun at virtually the same time that Officer Ward deployed his taser, if not sooner.
(Id. 708-09.) Officer Snook, who had "sprinted" back to his car to get his beanbag shotgun (id. 709), had not yet returned when Ceballos was killed.
Officer Husk reported, after the incident, that he saw a knife in Ceballos' other hand as the distance narrowed between the officers and Ceballos. [Ceballos's friends] Castillo and Martinez say Ceballos was not carrying a knife. Officer Husk admits he never reported seeing this knife to any other officer until after he shot Ceballos, and that his commands to Ceballos were to drop the bat. Officers Ward and Snook and Commander Carbone did not see a knife until after Ceballos had been shot. A responding fire fighter reported seeing a closed pocketknife fall out of Ceballos' pocket after he had been shot, as responders rolled him over.
(Id. 710.)
B. Officer training
Every Thornton police officer is trained on the proper use of force, including deadly force. As for the use of force "against mentally ill, emotionally disturbed, or individuals in crisis," the City "offers a 40-hour Crisis Intervention Training (CIT) course." (Id. 710.)
CIT is specifically designed to train officers to deal with people in crisis by using techniques such as maintaining safety by using time and distance; taking steps to calm the situation by using quiet voices; avoiding getting too close, too fast; not rushing into the situation; assessing the need for backup; making a plan with fellow officers for the best course of action; gathering information from those on the scene; avoiding escalating the situation; communicating in a calm, non-threatening manner; not having multiple people giving commands at the same time; and containing the subject by establishing a perimeter.
(Id. )
CIT training is not mandatory for the City's officers and only half of them are CIT-trained. Relevant here, Officer Husk was not CIT-trained, but Officer Ward was. The officers in this case did not employ CIT strategies. Plaintiffs submitted expert evidence that the City "is not in compliance with industry standards" in CIT training (id. 711), and that "the failure to use de-escalation techniques, the department's action in not training Officer Husk in CIT, and Officer Husk's action in assuming responsibility for [a] mental health crisis situation simply because the call was in his district, were not consistent with well-established modern police standards" (id. 712).
C. This litigation
Ceballos's estate ("Ceballos") and his surviving widow and two children ("Plaintiffs") sued Officer Husk and the City of Thornton, asserting both federal and state-law claims. Relevant here, the district court denied Defendants summary judgment on three claims: 1) Ceballos's 42 U.S.C. § 1983 claim alleging that Officer Husk used excessive force in violation of the Fourth Amendment; 2) Ceballos's § 1983 claim alleging the City failed to train Officer Husk adequately to deal with mentally ill or emotionally disturbed individuals; and 3) Plaintiffs' state-law wrongful *1212 death tort claim against Officer Husk. Defendants immediately appealed.
II. LEGAL DISCUSSION
We start by acknowledging the obvious-the parties have very different views as to what happened on the August night in question. Plaintiffs assert that the circumstances at the moment Officer Husk shot Ceballos did not warrant the use of lethal force. Plaintiffs further contend that, even if lethal force was justified at that moment, Officer Husk's unreasonable conduct immediately preceding the shooting wrongfully provoked the need for lethal force. Moreover, Plaintiffs assert that, had the City trained its officers in how best to approach individuals in crisis-those who are emotionally disturbed, mentally ill or have diminished mental capacity due to, for example, drugs or alcohol-Officer Husk could have used that training to try to de-escalate the situation with Ceballos and perhaps avoid the need for lethal force.
Defendants, on the other hand, while conceding CIT training is valuable, contend that there was no time to use CIT methods to try to de-escalate this situation because of the risk Ceballos presented to public safety. Defendants assert it was incumbent upon officers to gain control of Ceballos as quickly as possible. With those two general perspectives in mind, we now address the specific issues presented by this interlocutory appeal.
A. Ceballos's 42 U.S.C. § 1983 excessive-force claim against Officer Husk
Ceballos seeks damages from Officer Husk under § 1983, alleging that the officer violated the Fourth Amendment by using excessive force when he shot Ceballos. In his defense, Officer Husk moved for summary judgment, asserting he was entitled to qualified immunity.
We review the denial of a summary judgment motion raising qualified immunity questions de novo. Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions. After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. Applying the same standards as the district court, we must determine whether the plaintiff has satisfied a heavy two-part burden. The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether the right was sufficiently clear that a reasonable officer would understand that what he is doing violates that right.
... If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. In short, although we review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.
*1213 Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (citations, internal quotation marks, alteration omitted); see also Cox v. Glanz, 800 F.3d 1231, 1243 (10th Cir. 2015).
Here, the district court denied Officer Husk qualified immunity, ruling that Ceballos had stated a clearly established Fourth Amendment violation and that there were genuinely disputed issues of material fact that precluded granting the officer summary judgment on that Fourth Amendment claim. Although it is not clear from the record whether the district court properly applied the correct legal framework for ruling on a qualified-immunity defense raised in a summary judgment motion, our review of the court's summary judgment decision is de novo, and so we proceed under the framework provided by Medina, 252 F.3d at 1128, and Cox, 800 F.3d at 1243.
However, this court has jurisdiction to consider Husk's interlocutory appeal from the denial of qualified immunity only to the extent that it presents abstract issues of law. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We do not have jurisdiction to review the district court's determination that there are disputed factual issues that preclude summary judgment. See Johnson, 515 U.S. at 307, 115 S.Ct. 2151.
On appeal, Officer Husk does not challenge the clearly established general Fourth Amendment principles that the district court identified as applicable to the situation presented here. Instead, Husk contends only that this clearly established law was not sufficiently precise and tailored to this factual scenario to apprise him that his conduct in this situation violated the Fourth Amendment.
To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, "or the weight of authority from other circuits," that would have put an objective officer in Husk's position on notice that he was violating Ceballos's Fourth Amendment rights. Carabajal v. City of Cheyenne, 847 F.3d 1203, 1210 (10th Cir.), cert. denied, --- U.S. ----, 138 S.Ct. 211, 199 L.Ed.2d 118 (2017). As the district court recognized,
[a] police officer violates an arrestee's clearly established Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not "objectively reasonable" in light of the facts and circumstances confronting him. Graham v. Connor, 490 U.S. 386, 396 [109 S.Ct. 1865, 104 L.Ed.2d 443] (1989). Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Id.
(Aplt. App. 712.)
"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ... And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."
Kisela v. Hughes, --- U.S. ----, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865 ). However, officers are not justified in using deadly force unless objectively reasonable officers in the same *1214 position "would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Thomson v. Salt Lake Cty., 584 F.3d 1304, 1313 (10th Cir. 2009) (internal quotation marks, emphasis omitted); see also Kisela, 138 S.Ct. at 1152 (discussing Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ).
The district court further correctly recognized that
[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force. Hastings v. Barnes, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (unpublished); see also Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001) ; Allen v. Muskogee, Okl., 119 F.3d 837, 840 (10th Cir. 1997) ; Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir. 1995). However, only reckless and deliberate conduct that is "immediately connected to the seizure will be considered." Hastings, 252 Fed. Appx. at 203 (citing Medina, 252 F.3d at 1132 ).[2] Mere negligence or conduct attenuated by time or intervening events is not to be considered. Id., citing Sevier, 60 F.3d at 699 n.8. The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation. See Giannetti v. City of Stillwater, 216 Fed. Appx. 756, 764 (10th Cir. 2007) (unpublished); Allen, 119 F.3d at 840, 842 ; Sevier, 60 F.3d at 699, 701 and n.10.
(Aplt. App. 713 (footnote added).) But "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable." Jiron, 392 F.3d at 414.
Officer Husk does not dispute these clearly established Fourth Amendment principles. Instead, he contends that this established law is too general to have warned him that the specific actions he took during the confrontation with Ceballos would violate the Fourth Amendment.
The Supreme Court has warned against defining a clearly established right "at a high level of generality." White v. Pauly, --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). Instead, "the clearly established law must be 'particularized' to the facts of the case." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). This is not to say that there must be "a case directly on point for a right to be clearly established." Kisela, 138 S.Ct. at 1152 (quoting White, 137 S.Ct. at 551 ). But the "existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting White, 137 S.Ct. at 551 ). "A clearly established right is one that is 'sufficiently clear that every reasonable official *1215 would have understood that what he is doing violates that right.' " Mullenix v. Luna, --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ).
1. Clearly established Tenth Circuit case law provided an objective officer in Husk's position notice that his conduct (as we accept it here) violated the Fourth Amendment
Here, Ceballos is able "to identify a [prior] case where an officer acting under similar circumstances as Officer [Husk] was held to have violated the Fourth Amendment." White, 137 S.Ct. at 552. That case is Allen v. Muskogee, 119 F.3d 837, 839-41 (10th Cir. 1997). There, Terry Allen "left his home after an altercation with his wife and children," taking ammunition and several guns with him. Id. at 839. Officers were told that Allen "was armed and had threatened family members," and that there was an eleven-year-old outstanding warrant for his arrest. Id. Allen drove to his sister's home and parked his car out front; she called police to report that Allen was "threatening suicide." Id. Three officers arrived to find that "Mr. Allen was sitting in the driver's seat with one foot out of the vehicle. He had a gun in his right hand, which was resting on the console between the seats." Id. Lieutenant Smith "approached the bystanders who were standing near Mr. Allen's vehicle, and ordered them to step back, which they did." Id.
As Lt. Smith repeatedly told Mr. Allen to drop his gun, Officer Bentley McDonald arrived and joined Lt. Smith at the driver's side door. Lt. Smith then reached into the vehicle and attempted to seize Mr. Allen's gun, while Officer Bentley held Mr. Allen's left arm. Officer Bryan Farmer, who arrived with Officer Bentley, approached Mr. Allen's car from the passenger side, and attempted to open a passenger side door. Mr. Allen reacted by pointing the gun toward Officer Farmer, who ducked and moved behind the car. Mr. Allen then swung the gun toward Lt. Smith and Officer McDonald, and shots were exchanged. Lt. Smith and Officer McDonald fired a total of twelve rounds into the vehicle, striking Mr. Allen four times. The entire sequence, from the time Lt. Smith arrived to the time Mr. Allen was killed, lasted approximately ninety seconds.
Id.
In analyzing these circumstances, Allen first set forth the relevant Fourth Amendment principles, the same principles the district court recognized in this case:
The excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force. Of course, the use of force must be judged from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments about the amount of force that is necessary in a particular situation. However, ... the reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force. We will thus consider an officer's conduct prior to the suspect's threat of force if the conduct is "immediately connected" to the suspect's threat of force.
Id. at 840 (citations, internal quotation marks, alteration omitted).
Applying these principles, Allen held that that a jury could find that the officers used excessive force under the circumstances *1216 presented in that case. Id. at 840-41. In particular, Allen noted that there was disputed evidence as to how Lt. Smith approached Allen: "[S]ome deposition testimony indicate[d] that Lt. Smith ran 'screaming' up to Mr. Allen's car and immediately began shouting at Mr. Allen to get out of his car; other testimony indicates that Lt. Smith approached cautiously and tried talking Mr. Allen into giving up the gun." Id. at 841. Because "[t]he entire incident, from the time Lt. Smith arrived to the time of the shooting, took only ninety seconds[,] ... the officers' preceding actions were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the" inquiry into the reasonableness of the officers' actions. Id. In light of this evidence, Allen held that "a reasonable jury could conclude ... that the officers' actions were reckless and precipitated the need to use deadly force." Id.
The circumstances at issue in Allen are closely analogous to those at issue here. Officer Husk shot and killed an emotionally distraught Ceballos within a minute of arriving on scene. Under the Estate's version of the facts-which Husk accepts as true for purposes of this appeal-Husk approached Ceballos quickly, screaming at Ceballos to drop the bat and refusing to give ground as Ceballos approached the officers.
In fact, the circumstances in Allen actually provide stronger justification for the police shooting at issue there. Allen was armed with a weapon-a gun-capable of harming someone from a much greater distance and with greater lethal potential than Ceballos's baseball bat (or at worst, his pocket knife). Further, unlike this case where there were no members of the public in the area when officers approached Ceballos, in Allen, the officers had to tell bystanders to get back as officers approached Allen's car. In Allen, then, there was arguably a more compelling reason for officers to take precipitous action and ultimately to use fatal force than is presented in our case. Nevertheless, the Tenth Circuit held in Allen that the officers were not entitled to summary judgment on the issue of whether they violated Allen's constitutional rights. That case, then, was sufficient, a fortiori , to put Officer Husk on notice that his actions (as we must accept them here) violated Ceballos's Fourth Amendment rights.
Our conclusion, that Allen put Husk on notice that his conduct violated the Fourth Amendment, is bolstered by Tenth Circuit cases decided both before and after Allen. Before Allen, this court, in Sevier v. City of Lawrence, 60 F.3d 695, 697-99 (10th Cir. 1995), set forth the same legal principles that Allen later applied in factually similar circumstances-where officers shot and killed a despondent man who had a knife and had locked himself in his bedroom when, after coaxing him out of his room, the man refused to drop his knife and instead lunged at one of the officers. Ultimately, however, Sevier held this court did not have jurisdiction to consider Defendants' interlocutory appeal from the denial of qualified immunity and so we did not decide whether a jury could find that the officers violated the deceased's Fourth Amendment rights in that case. Id. at 700-01. Nevertheless, importantly, both the language and reasoning in Sevier was picked up and quoted in Allen during its analysis of the underlying Fourth Amendment law. See Allen, 119 F.3d at 840-41.
After Allen, this court, in an unpublished decision, applied the clearly established Fourth Amendment principles recognized in Allen, to uphold denying qualified immunity to four officers called to a home about a suicidal man, after they chased the man into a small bedroom where, after he grabbed a samurai sword, they pepper sprayed him, causing him to *1217 lift the sword and move toward the officers. See Hastings v. Barnes, 252 F. App'x 197, 198-200, 203-07 (10th Cir. 2007) (unpublished). Neither Sevier, decided on jurisdictional grounds, nor the unpublished decision in Hastings, by themselves created the clearly established law that would have put an objective officer in Husk's position that his conduct in approaching and shooting Ceballos was unconstitutional.[3] But Sevier and Hastings strengthen our conclusion that, in light of Allen, a reasonable officer in Husk's position would have known that his conduct (viewed in the light most favorable to Ceballos) violated his Fourth Amendment right to be free from excessive force.
2. Officer Husk's attempts to distinguish Allen from the circumstances at issue here are unpersuasive
Officer Husk's attempt to distinguish Allen is unpersuasive. He contends that, in Allen, the responding officers' knowledge that the suspect was suicidal or suffered from a "mental illness or disability ... required a modified response," while in this case Officer Husk did not know that Ceballos had a mental illness or disability. (Aplt. Br. 22.) We decline to cabin Allen so narrowly. The facts here, as we must accept them, made clear that the responding officers knew Ceballos's capacity to reason was diminished, whatever the underlying reason might have been-mental health problems, emotional distress, drunkenness, or drugs. The dispatcher described Ceballos to the responding officers as "acting crazy," drunk, and possibly on drugs. (Aplt. App. 707.) When officers arrived, they saw Ceballos pacing in his driveway, swinging a bat and yelling at no one in particular. Ceballos's two companions had told the officers that "Ceballos was not acting right and might be on drugs." (Id. 707-08.) One of the responding officers recognized that Ceballos "didn't seem right." (Id. 709.) In light of all that, a jury might reasonably find that an objective officer in Husk's position should have recognized that as well and would have taken those facts into account before provoking a fatal encounter. These facts are sufficient for Allen to provide clearly established guidance to an objective officer in Husk's position.
Officer Husk also contends that officers here were investigating "violent criminal activity," while in Allen officers were instead conducting a welfare check. (Aplt. Br. 23.) But in Allen, the decedent had a gun and, like Ceballos, had threatened his family members earlier that same day. See 119 F.3d at 839. Officers also knew there was an outstanding arrest warrant for Allen, albeit an old one. Id. The situations presented here and in Allen are sufficiently analogous for Allen to provide Husk with notice that his actions, as we accept them here, were unconstitutional.
Husk argues that, while the decedent in Allen, though armed, was not acting aggressively prior to the officers' intervention and became aggressive only after being provoked by the officers' challenged actions, Ceballos was already pacing in his driveway, swinging a bat and yelling, when officers arrived. Even so, Ceballos did not retreat into his garage and then become aggressive toward the officers until Officers Husk and Ward approached him directly, both yelling commands at him. Ceballos's prior conduct in his own driveway, which posed harm to no one, does not *1218 meaningfully distinguish this case from the circumstances at issue in Allen and such conduct surely could not lead reasonable officers to believe they were justified in fatally shooting Ceballos within one minute of the initial encounter. Thus, Officer Husk's arguments attempting to distinguish Allen ultimately fall short.
Officer Husk next asserts that there are other Tenth Circuit cases that support his qualified-immunity defense. But the cases on which he relies are distinguishable. In Jiron, 392 F.3d at 411-13, 418-19, Medina, 252 F.3d at 1126-27, 1132, and Thomson, 584 F.3d at 1309-10, 1320, the officers were entitled to qualified immunity for using deadly force to keep an armed suspect from escaping into the general public or to locate and stop an armed person who had already escaped into the general public. That was not the situation presented here. There was no one near Ceballos when the Thornton officers approached him, and Ceballos remained in his driveway or garage. Further, the mere possibility that Ceballos might have presented a threat to the general public, had he left his driveway, does not weigh heavily on Officer Husk's side. See Cordova v. Aragon, 569 F.3d 1183, 1190 (10th Cir. 2009) (holding that officers' conduct in shooting a suspect who was driving the wrong way on a highway was not made reasonable by the "mere possibility" that the suspect posed a threat to "fellow motorists" where the facts at issue "do not ... show that any other motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves"); see also Garner, 471 U.S. at 11, 105 S.Ct. 1694 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").
Officer Husk also relies on Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008). But there are a number of facts that distinguish Larsen from this case, the most relevant being that the plaintiff in Larsen did not claim that the officers' conduct caused the need for them to use deadly force. See id. at 1259-64.
We conclude, then, that this court's decision in Allen adequately notified Officer Husk that his conduct in confronting Ceballos (as we accept the facts here) violated the Fourth Amendment. We, therefore, affirm the district court's decision to deny Officer Husk qualified immunity.
3. Response to dissent
a. "Obviously unconstitutional" exception to qualified immunity
At pages 1230-32, the dissent addresses a possible argument to defeat qualified immunity that was not raised by the plaintiff-that the officer's conduct was so obviously unconstitutional that it is not necessary for the plaintiff to show clearly established existing law prohibiting such conduct. Although we agree that argument is a potential ground for defeating qualified immunity, see, e.g., District of Columbia v. Wesby, --- U.S. ----, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) (recognizing "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances"); Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), petition for cert. filed, (U.S. Jan. 29, 2019) (No. 18-986), we do not address this argument because the plaintiff did not assert it.
b. Reliance on case law decided after the events giving rise to this litigation
The dissent relies on two cases, Clark v. Colbert, 895 F.3d 1258 (10th Cir. 2018), *1219 and Apodaca v. Raemisch, 864 F.3d 1071 (10th Cir. 2017), cert. denied, --- U.S. ----, 139 S.Ct. 5, 202 L.Ed.2d 251 (2018), that were decided after Husk shot Ceballos to show that the law was not clearly established. (Dissent 1228 n.4, 1228-29, & 1231.) But our focus in deciding whether a constitutional right was clearly established is, instead, at the time the challenged conduct occurred. See Kisela, 138 S.Ct. at 1152. "Necessarily, resolution of this second [qualified-immunity] inquiry is governed by cases published before" Officer Husk shot Ceballos. Herrera v. City of Albuquerque, 589 F.3d 1064, 1071 (10th Cir. 2009) (internal quotation marks omitted); see also Wesby, 138 S.Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."); Plumhoff v. Rickard, 572 U.S. 765, 779, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (noting later decided cases could not give fair notice to officer).
Clark is easily distinguishable and not on point. In Clark, Clark's brother called police to report that he was having trouble restraining Clark, a schizophrenic individual suffering a psychotic episode. 895 F.3d at 1260. When sheriff's deputies arrived, they had trouble communicating with the "irritated" Clark, who was standing on his front porch holding a long knife. Id. at 1262. Very different from our case, deputies withdrew from Clark; called for backup; waited ten minutes for several additional officers to arrive; when the additional officers got there, the entire group planned a strategy to arrest Clark; they gathered "an array of nonlethal resources" to use when they approached Clark; and officers actually employed those nonlethal resources, ultimately unsuccessfully, before having to shoot Clark, who survived the non-lethal shots. Id. at 1262-63. This court determined that a reasonable jury could not find that the officers' conduct in Clark was unreasonable. Id. at 1261-64. The police conduct at issue in Clark is the antithesis of the manner in which Officer Husk approached Ceballos (as we must accept those facts for our purposes here). The actions that the police took in Clark are the very kind of actions that Plaintiffs assert Officer Husk should have undertaken before confronting Ceballos.
The other post-event case that the dissent improperly relies on is Apodaca, 864 F.3d 1071, but it was also distinguishable. In Apodaca it wasn't clear what facts were relied on in the earlier Perkins decision. Although the plaintiff alleged he had been deprived of all out-of-cell exercise, we used imprecise language in Perkins indicating that plaintiff was merely deprived only of "outdoor" exercise. In light of this ambiguity, it wasn't clearly established for purposes of Apodaca (where there was a denial of outdoor exercise but not out-of-cell exercise) that Perkins applied. In other words, in Apodaca, this court said a reasonable officer could read Perkins alone and not know what specific conduct Perkins prohibited. That problem does not arise here. Here, the legal right at issue is clear-that an officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property. Allen clearly established that constitutional right.
c. Dissent's improper reliance on hypothetical possibilities or disputed facts
In concluding that Husk's conduct did not violate rights clearly established in Allen, the dissent states that, different from Allen, Ceballos might have fled or he *1220 might have "enter[ed] another home in the neighborhood," and "the officers might reasonably have thought that [Ceballos] was retrieving a gun" from the garage. (Dissent at 1227 & 1228.) But there are simply no facts in the record, as we must accept it for purposes of this interlocutory appeal, that suggest any of these "facts." Furthermore, although the dissent states a number of times that Ceballos was in a "residential neighborhood" (id. at 1223, 1226, 1228, 1229), the specific facts that we must accept here are that he was in his own driveway, with no one else around, and he was fully contained at the time he was shot and killed.
d. The dissent's reliance on Thomson is misplaced
Given the facts as we must accept them here, the dissent's reliance on Thomson is misplaced. The dissent contends that a reasonable officer in Husk's position would not have known that the manner in which he approached Ceballos violated the Fourth Amendment. But Thomson is not factually analogous to the situation presented here and, therefore, could not have informed Husk as to the constitutionality of his actions at the time he took them.
The situation in Thomson was that Chad Thomson threatened his wife with a gun and also threatened suicide before leaving his home with a gun at 2:00 a.m. 584 F.3d at 1309-10. Police arrived, confirmed a gun was missing from the Thomson home, and then began a yard-by-yard search for Thomson in the "darkened neighborhood," aided by a police dog. Id. at 1310. While officers were searching, Thomson relayed to a police lieutenant, via a phone call through Thomson's friend, that if officers did not want to get hurt, they should leave the area. Id. When the dissent says, then, that "The Thomson suspect was in a residential neighborhood; Mr. Ceballos was too" (Dissent 1229), we cannot agree. Unlike in our case, an agitated and armed Thomson had already escaped somewhere in the dark neighborhood when police arrived. Under those circumstances, this court held that officers acted reasonably in searching for Thomson and in using a police dog to assist in that search. See Thomson, 584 F.3d at 1320-22. Moreover, unlike here, Thomson was armed with a gun that he pointed at officers, at the police dog biting him, and at himself during the ten seconds after officers found Thomson and before they shot him. Id. at 1311, 1317-18. The facts in Thomson are not analogous to the circumstances presented here.
For all of these reasons, we respectfully disagree with the dissent's analytical framework and the conclusion the dissent reaches. Instead, we conclude, based on the facts as they are presented to us here on this interlocutory appeal, that the Tenth Circuit decision in Allen would have put a reasonable officer on notice that the reckless manner in which Husk approached Ceballos and his precipitous resort to lethal force violated clearly established Fourth Amendment law
B. Ceballos's § 1983 failure-to-train claim against the City
The City appeals the district court's decision to deny it summary judgment on Ceballos § 1983 claim alleging that the City failed to train its officers adequately in how best to deal with mentally ill or emotionally disturbed individuals. Acknowledging that ordinarily it cannot immediately appeal the denial of summary judgment, see Moore v. City of Wynnewood, 57 F.3d 924, 929 (10th Cir. 1995) (citing Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 41-42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) ), the City asks us, nevertheless, to exercise pendent appellate jurisdiction here to consider the City's interlocutory appeal. We have discretion to exercise pendent appellate *1221 jurisdiction "where the otherwise nonappealable decision is 'inextricably intertwined' with the appealable decision, or where review of the nonappealable decision is 'necessary to ensure meaningful review' of the appealable one." Moore, 57 F.3d at 930 (quoting Swint, 514 U.S. at 51, 115 S.Ct. 1203 ). But, because "the exercise of pendent appellate jurisdiction is generally disfavored[,] ... [w]e exercise this discretionary authority sparingly." Cox, 800 F.3d at 1255-56 (internal quotation marks omitted).
The City claims that its appeal is "inextricably intertwined" with Officer Husk's permissible appeal from the denial of qualified immunity.
[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal-that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well.
Moore, 57 F.3d at 930 (applying Swint ). That is not the case here.
Officer Husk's permissible interlocutory appeal raised the legal question of whether the district court erred in identifying clearly established law that put the officer on notice that his use of force, as Ceballos alleges it, was excessive and in violation of the Fourth Amendment. The City's interlocutory appeal involves, instead, the City's training of its officers.
In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation[ ] with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.
Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003) (quoting, e.g., City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and Allen, 119 F.3d at 841-42 ). In denying the City summary judgment, the district court ruled that Ceballos had established the second enumerated element of his failure-to-train claim and that there were genuinely disputed material issues of fact as to the remaining elements.
On appeal, the City reasserts its argument that there is no evidence that its training was inadequate, but that if its training was inadequate, there is no evidence that any inadequacy rose to the level of deliberate indifference or caused any unconstitutional use of force against Ceballos. These issues do no overlap with the issue Officer Husk permissibly raised in his interlocutory appeal. Moreover, in resolving Officer Husk's interlocutory appeal, we concluded there was clearly established law that put the officer on notice that the alleged force he used against Ceballos was unconstitutional. But that determination does not "necessarily resolve[ ]" Moore, 57 F.3d at 930, the training issues that the City raises in its appeal. We, therefore, decline to exercise pendent jurisdiction over the City's interlocutory appeal.
C. State-law wrongful death claim against Officer Husk
Ceballos's widow and children assert a wrongful death tort claim against *1222 Officer Husk under Colorado law. Husk claims he is immune from such a tort claim under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24-10-101 to 24-10-120, which provides that a public employee acting within the scope of his employment is immune from liability for any tort claim unless the employee's conduct "was willful and wanton," id. § 24-10-111(2)(a).[4] Colorado treats this statutory immunity as sovereign immunity from suit. See Martinez v. Estate of Bleck, 379 P.3d 315, 317, 320-22 (Colo. 2016). It is not, however, Eleventh Amendment immunity. See Griess v. Colorado, 841 F.2d 1042, 1044-45 (10th Cir. 1988) (per curiam). Instead this CGIA immunity involves "tort liability of the state enforceable in its own courts." id. (citing, among other provisions of the CGIA, Colo. Rev. Stat. §§ 24-10-119[5] ), which federal courts, under Erie, honor when exercising supplemental jurisdiction over a Colorado tort claim asserted against a public employee,[6] see 13 Charles Alan Wright, et al., Federal Practice & Procedure, § 3524.2, p.371 (3d ed. 2008); see also Beard v. City of Northglenn, 24 F.3d 110, 118 (10th Cir. 1994) (applying Colo. Rev. Stat. § 24-10-118(2)(a) to Colorado tort claim asserted in federal action).[7]
In the district court, Officer Husk sought summary judgment, asserting that he is entitled to immunity from tort liability under the CGIA because Plaintiffs have no evidence that his conduct in shooting Ceballos was willful and wanton. See *1223 Smith v. Bd. of Educ. of Sch. Dist. Fremont RE-1, 83 P.3d 1157, 1167 (Colo. Ct. App. 2003) (stating that "the plaintiff must prove that the defendant's action was willful and wanton"); see also L.J. v. Carricato, 413 P.3d 1280, 1288 (Colo. Ct. App. 2018). The district court rejected Husk's argument for summary judgment, ruling:
The disputed evidence here-including the combination of haste, failure to gather information, failure to use de-escalation techniques, lack of apparent immediate danger to the public, failure to wait for Officer Snook to retrieve his less lethal shotgun, and the creation of exigent circumstances by the officers' own actions-could support a reasonable inference of willful and wanton disregard of Ceballos' rights and safety.
(Aplt. App. 717.)
Officer Husk challenges the district court's decision to deny him summary judgment on his CGIA-immunity defense in this interlocutory appeal. As the appellant, he bears the burden of establishing our appellate jurisdiction. See E.E.O.C. v. PJ Utah, LLC, 822 F.3d 536, 542 n.7 (10th Cir. 2016). Husk has failed to meet his burden. He incorrectly asserts that we have jurisdiction to consider this portion of his interlocutory appeal because Colorado law provides for such an interlocutory appeal from the denial of immunity under the CGIA. See Colo. Rev. Stat. § 24-10-118(2.5).[8] It is "federal, not state, law [that] controls the appealability of the district court's order" in federal court. Aspen Orthopaedics, 353 F.3d at 837. Husk offers no basis grounded in federal law that permits us to consider this portion of his interlocutory appeal. See Raley v. Hyundai Motor Co., 642 F.3d 1271, 1275 (10th Cir. 2011) ("It is appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear h[is] appeal."); see also United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 n.2 (10th Cir. 1996). We, therefore, dismiss this portion of his interlocutory appeal for lack of appellate jurisdiction.[9]
III. CONCLUSION
For the foregoing reasons, we AFFIRM the district court's decision to deny Officer Husk qualified immunity on the § 1983 excessive-force claim. We DISMISS for lack of appellate jurisdiction both the City's appeal from the denial of summary judgment on the § 1983 failure-to-train claim and Husk's appeal regarding the state-law wrongful death claim.

Defendants assert that the officers did not know whether there was anyone else in Ceballos's house. But Defendants do not cite to any evidence that suggests there might have been someone else in the house. Officers could have asked Ceballos's wife and friends whether there was anyone else in the house, but the officers did not do so.

We recently reaffirmed this longstanding Tenth Circuit law, notwithstanding County of Los Angeles v. Mendez, --- U.S. ----, 137 S.Ct. 1539, 1547 n.8, 198 L.Ed.2d 52 (2017). See Pauly v. White, 874 F.3d 1197, 1219 n.7 (10th Cir. 2017), cert. denied, --- U.S. ----, 138 S.Ct. 2650, 201 L.Ed.2d 1063 (2018) ; see also Clark v. Colbert, 895 F.3d 1258, 1264 (10th Cir. 2018) ("[P]olice officers can incur liability for 'reckless' conduct that begets a deadly confrontation," citing Allen, 119 F.3d at 841 ); Pauly, 874 F.3d at 1219-20 ("Our precedent recognizes that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." ' " (quoting Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quoting Sevier, 60 F.3d at 699 )).

"Although not dispositive ... because of its unpublished status," Estate of Booker v. Gomez, 745 F.3d 405, 428 n.29 (10th Cir. 2014), "we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established," Morris v. Noe, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012).

More specifically, § 24-10-118(2)(a) provides, in relevant part:
A public employee shall be immune from liability in any claim for injury, whether brought pursuant to this article, section 29-5-111, C.R.S. [ (addressing peace officers' liability and employers' indemnification of peace officers) ], the common law, or otherwise, which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton....
(Emphasis added.)

Section 24-10-119 provides in relevant part that "[t]he provisions of this article shall apply to any action against a public entity or a public employee in any court of this state having jurisdiction over any claim brought pursuant to any federal law, if such action lies in tort or could lie in tort...."

Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (addressing federal courts' diversity jurisdiction); see Aspen Orthopaedics & Sports Medicine, LLC v. Aspen Valley Hosp. Dist., 353 F.3d 832, 836-37 (10th Cir. 2003) (applying Erie principles when exercising supplemental jurisdiction over state-law claim).

Wright and Miller distinguish between Eleventh Amendment immunity and a State's state-law sovereign immunity from liability in its own courts. More specifically, in discussing Eleventh Amendment immunity, Wright and Miller note:
A related aspect of the Erie doctrine ... arises when state-granted immunity is honored by a federal court sitting in diversity. A state has the power to grant immunity in its own courts to officers, agents, or other governmental entities. Consistent with the Erie doctrine, a federal court sitting in diversity will honor these immunities and dismiss the actions. It is important, however, to distinguish these state immunity Erie dismissals from bona fide Eleventh Amendment constitutional questions.
13 Wright, et al., Federal Practice and Procedure, § 3524.2, p.371. Although Wright & Miller address the application of Erie in diversity cases, see 28 U.S.C. § 1331, those same principles also apply here, where federal courts are instead exercising supplemental jurisdiction, see 28 U.S.C. § 1367, over the state-law wrongful death tort claim, see Aspen Orthopaedics, 353 F.3d at 836-37. This is the distinction the Tenth Circuit drew in Griess, when this court held that Colorado's enactment of the CGIA immunity provision at issue here did not waive the State's Eleventh Amendment immunity from suit in federal court on a federal § 1983 claim. See 841 F.2d at 1044-45.

The CGIA provides:
If a public employee raises the issue of sovereign immunity prior to or after the commencement of discovery, the court shall suspend discovery; except that any discovery necessary to decide the issue of sovereign immunity shall be allowed to proceed, and the court shall decide such issue on motion. The court's decision on such motion shall be a final judgment and shall be subject to interlocutory appeal.
Colo. Rev. Stat. § 24-10-118(2.5).

We further note that the evidentiary issue presented in this portion of Husk's appeal-whether the district court was correct that there is sufficient evidence for a jury to find that he acted willfully and wantonly-is the type of question that we would not have jurisdiction to consider in an interlocutory appeal even from the denial of qualified immunity from § 1983 liability. See Johnson, 515 U.S. at 307, 115 S.Ct. 2151.