**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 4, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TAYLOR BURKE, as the Special
Administrator of the Estate of Thomas
Gay, deceased,

     Plaintiff - Appellee,

v.

JESSICA PITTS, Officer; WILLIAM
LEWIS, Officer,

     Defendants - Appellants,

and

CITY OF BARTLESVILLE,

     Defendant.

No. 24-5134

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:20-CV-00244-WPJ-SH)**
_____

Scott B. Wood, Wood, Puhl & Wood, P.L.L.C., Tulsa, Oklahoma, appearing for
Appellants.

John W. Warren (Donald E. Smolen, II, with him on the brief), Smolen Law, Tulsa,
Oklahoma, appearing for Appellee.
_____

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.

_____

Bartlesville, Oklahoma Police Officers William Lewis and Jessica Pitts responded to a domestic disturbance call from Thomas Gay's father, Willis Gay Jr.[1] Within four minutes of their arrival, Officer Lewis tased Thomas multiple times and Officer Pitts fatally shot him. Thomas's Estate (the "Estate") sued the officers in their individual capacities and the City of Bartlesville under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment.

The district court denied the officers' summary judgment motion seeking qualified immunity. It held issues of fact would permit a reasonable jury to find they violated Thomas's clearly established constitutional rights. The officers now ask us to revisit the district court's factual determinations, which we lack interlocutory jurisdiction to do. Possible exceptions to our jurisdictional limits do not apply because (1) the record does not blatantly contradict the district court's factual analysis, and (2) the district court did not commit legal error en route to its factual determinations. Beyond their factual challenges, the officers' argument that the district court erred in applying the Fourth Amendment's objective reasonableness standard fails. They have waived any further jurisdictionally appropriate argument challenging whether a reasonable jury could find a constitutional violation. Clearly established law as of the date of the incident precludes qualified immunity.

_____

[1] Because they share a common surname, we refer to Thomas Gay and Willis Gay Jr., by their first names for ease of reference.

2

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual Background*

As a general rule, on interlocutory review "[t]he district court's factual findings and reasonable assumptions comprise the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020) (quoting *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015)).  "We therefore quote the district court's account of the facts . . . ."  *Id.* at 1275.

> On June 1, 2019, law enforcement personnel from [Bartlesville Police Department ("BPD")] were dispatched to the home of Mr. Willis Gay Jr. Defendant Officers arrived on scene shortly after 8:00pm.  Upon arrival, Mr. Gay Jr. informed Defendant Officers that Thomas was behaving erratically (and he may have been under the influence of drugs). Mr. Willis Gay Jr. wanted Thomas removed from his home.
>
> Prior to entering the home, Mr. Willis Gay Jr. told Defendant Officers that Thomas was unarmed—but warned them that Thomas keeps making furtive movements towards his back pocket.
>
> Willis Jr. then grabbed a key, opened the door, and walked Defendant Officers into his house.  Once inside, Defendant Officers saw that Thomas was sweating profusely and bug-eyed.  He did not react to their presence.
>
> As everyone entered the house, it was clear that Thomas was holding an innocuous object (apparently a ventriloquist doll).  Officer Lewis immediately told Thomas to drop (or put down) the object he was holding.  At about the same time, Officer Lewis pointed his Taser at Thomas.  Without any further commands, Officer Lewis tased Thomas. And Officer Pitts unholstered and drew her service weapon.
>
> In response, Thomas walked backwards into a bedroom.  He started to lie on the ground, but then stood back up.  At this point, Officer Lewis tased Thomas (at least) once more.  But the Taser failed to incapacitate

Thomas—due to user error—and a brief skirmish took place. Officer Lewis tried to grab Thomas, but Thomas pushed him away. Thomas then moved towards the bedroom door—which Officer Pitts perceived as a threat. As Thomas walked towards the door, he moved his hand towards his back pocket—at which time Officer Pitts shot Thomas twice in quick succession. Thomas was killed within 3 minutes of Defendant Officers' arrival.

*Burke v. City of Bartlesville*, No. 20-cv-244, 2024 WL 4508959, at *13

(N.D. Okla. Oct. 16, 2024). Further, the district court found disputed whether

Thomas was holding either a weapon or a black object before he was shot, *id.*

at *10, and determined that a reasonable jury could find he was holding

neither, *see id.* at *10, *13, *17, and possibly nothing at all.[2] The parties

dispute many of the facts. *Id.* at *13. The officers seek to relitigate certain

factual disputes on appeal. Aplt. Br. at 10-33.

## B. *Procedural Background*

The Estate sued the officers in their individual capacities under 42 U.S.C.

§ 1983, alleging that the tasing and shooting violated the Fourth Amendment's

protection against excessive force. *Burke*, 2024 WL 4508959, at *1. The officers

moved for summary judgment, asserting qualified immunity. *Id.* The district court,

viewing the evidence in the light most favorable to the Estate, held the officers were

---

[2] The district court not only said a reasonable jury could find that Thomas had no weapon or black object in his hands before the shooting, it also suggested a reasonable jury could find Thomas was not holding anything. It said the question of "[w]hat was Thomas holding when he was shot (if anything)?" was "unanswered" in light of Willis's and Officer Lewis's deposition testimony that they did not see anything in Thomas's hand when he was shot. *See Burke*, 2024 WL 4508959, at *10, *13, *18.

not entitled to qualified immunity. *Id.* at \*14-26, \*30.[3] It concluded (1) the Estate presented sufficient evidence for a reasonable jury to find the officers violated Thomas's constitutional rights, *id.* at \*15-21, and (2) the law was clearly established when the violations occurred, *id.* at \*21-26. The officers brought this interlocutory appeal.

## II.  DISCUSSION

The officers argue (A) we have jurisdiction to review certain factual determinations de novo and (B) the district court erred in denying them qualified immunity. We disagree and affirm the district court.

### A.  *Scope of Interlocutory Appellate Jurisdiction*

Our review of a qualified immunity denial on an interlocutory appeal is limited to legal questions unless an exception allows us to consider whether the district court made erroneous factual determinations. But contrary to the officers' contentions, no exceptions apply. We therefore must accept the district court's factual determinations and confine our review to legal issues.

### 1.  **Legal Background**

#### a.  *Interlocutory jurisdiction – legal issues only*

We have jurisdiction to review "all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "Orders denying summary judgment are

---

[3] The Estate also brought a § 1983 municipal liability claim against Bartlesville under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court denied Bartlesville's motion for summary judgment, a ruling that is not at issue in this appeal.

ordinarily not appealable final [decisions] for purposes of . . . § 1291." *Sawyers*, 962 F.3d at 1281 (alterations in original) (quoting *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)). But the denial of qualified immunity at summary judgment is "immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law." *Id.* (quoting *Fancher v. Barrientos*, 732 F.3d 1191, 1198 (10th Cir. 2013)).

Our interlocutory jurisdiction is thus generally limited to "purely legal question[s]." *Teetz ex rel. Lofton v. Stepien*, 142 F.4th 705, 712 (10th Cir. 2025). We lack jurisdiction "to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Sawyers*, 962 F.3d at 1281 (quoting *Fancher*, 723 F.3d at 1199); *see Johnson v. Jones*, 515 U.S. 304, 317-18 (1995). If a district court concludes that a reasonable jury could find certain facts or a plaintiff has presented sufficient evidence to survive summary judgment, we must accept those determinations even if our own de novo review of the record might suggest otherwise. *Sawyers*, 962 F.3d at 1281.

b. *Exceptions*

We have recognized three narrow exceptions to this jurisdictional limitation. *See McWilliams v. Dinapoli*, 40 F.4th 1118, 1122 (10th Cir. 2022). We may review factual determinations de novo if the district court (1) failed to identify the factual disputes precluding summary judgment, (2) held a reasonable jury could find facts that are blatantly contradicted by the record, or (3) committed legal error en route to

6

a factual determination. *See id.*; *see also Love v. Grashorn*, 134 F.4th 1109, 1112 (10th Cir. 2025). The officers invoke the second and third exceptions here.

      i.  Blatant contradiction

"When the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record, this court does not accept that version of events but instead assesses the facts de novo." *Krueger v. Phillips*, --- F.4th ---, 2025 WL 2424209, at *4 (10th Cir. Aug. 22, 2025) (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1164 (10th Cir. 2021)); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007). "The blatant-contradiction 'standard is a very difficult one to satisfy.'" *Ellis v. Salt Lake City Corp.*, 147 F.4th 1206, 1225 (10th Cir. 2025) (quoting *Teetz*, 142 F.4th at 719).

The district court's version must be "'so utterly discredited by the record that no reasonable jury could have believed' it, constituting 'visible fiction.'" *Id.* (quoting *Scott*, 550 U.S. at 380-81). A party cannot merely point to "evidence that strongly supports [their] position but must instead point to evidence that completely and indisputably contradicts the challenged factual finding." *Id.* (alteration in original) (quotations and citations omitted). There is no blatant contradiction where the evidence is inconclusive or "could plausibly support two competing versions of events." *Id.* (quoting *Teetz*, 142 F.4th at 720).

      ii.  Legal error en route to a factual determination

When the district court's "factual determination is predicated on an erroneous legal conclusion," the factual determination is "deprived of any special solicitude it

7

might otherwise be owed on appeal" and need not be accepted as true. *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013).

2. **Analysis – No Exceptions Apply**

a. *Blatant contradiction*

The officers argue the record blatantly contradicts the district court's determinations that a reasonable jury could find (1) Thomas was moving toward the bedroom door (2) unarmed when Officer Pitts shot him.[4]

i. Moving toward the bedroom door

The officers contend deposition testimony from Willis and Officer Pitts and the autopsy report blatantly contradict that Thomas was moving toward the bedroom door. Aplt. Br. at 20-21, 27-28; Aplt. Reply Br. at 7-8. They claim the evidence "conclusive[ly]" shows "that Thomas was coming toward Officer Pitts when she shot him." Aplt. Br. at 28. Willis testified that Thomas "tried to come and run towards the door" and was "trying to get around the officer to the door." App., Vol. II at 377, 382. The officers point to the combination of Willis's statement that Thomas was

---

[4] The officers do not challenge the district court's factual determinations as to Officer Lewis's tasing. *See generally* Aplt. Br. at 14-33. The parties dispute whether Officer Lewis issued multiple commands and warned Thomas before deploying his taser. *Burke*, 2024 WL 4508959, at *6-7. Resolving factual disputes in the Estate's favor, the district court concluded the evidence supported a finding that Officer Lewis "told Mr. Thomas Gay to 'drop' or 'put down' something" when the officers first encountered Thomas in the living room. *Id.* at *17. "Because Thomas Gay did not drop the item after this first (and only command), Officer Lewis deployed the Taser," and "[n]o other commands were given during the remainder of the encounter." *Id.* On appeal, the officers do not argue the record blatantly contradicts that Officer Lewis gave a single command and failed to warn Thomas before tasing him.

"trying to get around the officer" and Officer Pitts's belief that Thomas was coming towards her as blatantly contradicting the district court's finding. Aplt. Br. at 20-21, 27-28 & n.13.

This argument fails to show a blatant contradiction because Willis testified that Thomas was trying to get around Officer Lewis, not Officer Pitts.[5] Willis testified that the "male officer"—Officer Lewis, not Officer Pitts—was "pushing against [Thomas]." Suppl. App., Vol. I at 106; *see Burke*, 2024 WL 4508959, at *9. According to Willis, immediately before Officer Pitts fired her gun, the male officer "was still . . . pushing" Thomas and Thomas was "trying to reach over" the officer who was pushing him "to make it to the door." Suppl. App., Vol. I at 107. Only after Officer Pitts shot Thomas did "he turn[] and look[] at her." *Id.* Willis's testimony supports that Thomas was moving towards the door.

The officers' reliance on Officer Pitts's testimony is misplaced. The blatant contradiction exception "generally applies only where '[d]ocumentary evidence' such as videos or photographs 'utterly discredit[s]' the version of events found by the district court." *Teetz*, 142 F.4th at 720 (alterations in original) (quoting *Vette*, 989 F.3d at 1164). "[C]onflicting testimonial accounts of the same events" do not meet the high bar, especially when "the source of the contradictory testimony is the

---

[5] The officers' argument that the district court could not rely on certain portions of Willis's deposition lacks merit. *See* Aplt. Br. at 20, 27 n.13. Although the Estate "inadvertently omitted" a page of Willis's deposition from its response to the officers' motion for summary judgment, it was attached to the response to Bartlesville's motion for summary judgment, Aplee. Br. at 20 n.11, and formed part of the summary judgment record, *see* Fed. R. Civ. P. 56(c).

defendant." *Id.* (quoting *Vette*, 989 F.3d at 1165).  Further, any conflict between

Willis's and Officer Pitts's testimony would show a factual dispute that the district

court resolved in the Estate's favor, not a blatant contradiction.

The officers also argue the "autopsy report conclusively demonstrates Thomas

was shot straight on as [Officer] Pitts asserted" because he "suffered an 'anterior'

***front*** shot to his right thigh with a backward and upward trajectory . . . [a]nd a

second shot to his left upper chest with a backward, downward, and rightward bullet

trajectory."  Aplt. Reply Br. at 7-8.  But the record lacks a diagram depicting the

bullet trajectory, and the officers presented no medical examiner or other expert

testimony to shed light on the autopsy report.  The report's brief description of the

bullet entry location and trajectory "comes nowhere close to satisfying the

blatant-contradiction exception." *Vette*, 989 F.3d at 1166.

ii.  Unarmed when shot

The officers argue the record also blatantly contradicts that Thomas was

unarmed when he was shot.  Aplt. Br. at 21-23.  It does not.  Officer Pitts stated in a

declaration that Thomas was holding a black object that she believed was a gun.  *Id.*

at 21; App., Vol. I at 105.  But the district court found this fact was disputed because

neither officer "mentioned 'a black object' in their incident reports," Willis informed

the officers that Thomas was unarmed, and Officer Lewis's "deposition testimony

expressly disavows the idea that Thomas was holding anything in his hand." *Burke*,

2024 WL 4508959, at *10-11, *18.  The district court also cited Willis's deposition,

*id.* at *10-11, in which he testified there was nothing "in either of [Thomas's] hands

10

in th[e] bedroom," App., Vol. II at 376; *see id.* at 384 ("If it was in his hand I would have seen. His hand was right up in front of my face."). Again, Officer Pitts's own "account[] simply do[es] not constitute the type of evidence that could satisfy the exception." *Vette*, 989 F.3d at 1165; *see Teetz*, 142 F.4th at 720.

The officers also rely on an Oklahoma State Bureau of Investigation "photo taken after the shooting showing a black remote next to Thomas," Aplt. Br. at 23, but it tells us nothing about the remote's location before or during the shooting. Because the photograph "could plausibly support [different] competing versions of events," the "blatant contradiction exception does not apply." *Teetz*, 142 F.4th at 720; *see Vette*, 989 F.3d at 1166 (refusing to apply the blatant contradiction exception because "[t]he photograph of Mr. Vette sitting down tells us nothing about the condition of the other side of his face"); *Clerkley v. Holcomb*, 121 F.4th 1359, 1363-64 (10th Cir. 2024) (refusing to apply the blatant contradiction exception because "the footage and the still-framed photographs do not show that Clerkley was holding something black in his hand").[6]

\* \* \* \*

---

[6] The officers argue the Estate's expert report, which addressed whether the officers' conduct was "consistent with nationally recognized standards of care in professional policing," App., Vol. III at 408, "is blatantly contradicted by the undisputed evidence." Aplt. Br. at 29. But they do not challenge any facts discussed in the expert's report. Instead, they contend the district court should not have relied on it to conclude that the officers recklessly created the need to use deadly force. *Id.* at 30-33; Aplt. Reply Br. at 14-15. Rather than a blatant contradiction factual argument, this is a legal argument, which we address below.

11

The officers fail to identify record evidence that blatantly contradicts what the district court held a reasonable jury could find.  They point to evidence supporting their version of the facts and ask us to ignore or discredit contrary evidence.

b.  *Legal error en route to a factual determination*

The officers appear to argue that the district court legally erred in determining facts relevant to the reasonableness of the officers' use of force.  Aplt. Br. at 21-23, 33; Aplt. Reply Br. at 9-13.  We disagree.

Excessive force claims are "analyzed under the Fourth Amendment's 'objective reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  The district court addressed "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Burke*, 2024 WL 4508959, at *14 (alteration in original) (quoting *Graham*, 490 U.S. at 397).  It recognized that "[a] court must review the officers' actions 'from the perspective of a reasonable officer on the scene.'"  *Id.* (quoting *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020)).  We see no legal error in the district court's statement of the objective reasonableness standard.

The officers' argument that the district court legally erred in applying the standard is not readily discernable.[7]  If they contend the court legally erred in

---

[7] At oral argument, we asked the officers' counsel to clarify whether they contend the district court legally erred en route to making a factual or legal determination. Counsel answered they argue both.  Oral Arg. at 02:14-03:07.

determining the officers' use of force was objectively unreasonable, that argument goes to the court's legal conclusion that the Estate can show a constitutional violation, which we address in our qualified immunity discussion below.

If the officers contend the district court legally erred en route to a factual determination, that argument is more in keeping with an exception to our limited interlocutory jurisdiction. But it is not well developed and lacks merit. The officers seem to say the court legally erred by considering testimony from all the witnesses in making its factual determinations, Aplt. Br. at 21-23, 33, though they fail to specify which factual determinations they have in mind, such as whether Thomas was approaching the bedroom door or Officer Pitts, whether Thomas was armed, or whether Thomas posed an immediate threat to the officers.

The officers claim the district court should not have considered Officer Pitts's testimony when evaluating Officer Lewis's use of force, *id.* at 33, nor considered Officer Lewis's and Willis's testimony when evaluating Officer Pitts's use of force, *id.* at 21-23. They appear to suggest that only testimony from the officer who used force matters. *Id.* at 21-23, 33. We disagree. Even though that officer's testimony may be relevant, a court "may not simply accept what may be a self-serving account by the police officer." *Pauly v. White*, 874 F.3d 1197, 1217-18 (10th Cir. 2017) (quotations omitted).

Objective reasonableness derives from "the perspective of a reasonable officer on the scene," *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 759 (10th Cir. 2021) (quotations omitted), and "the various conflicting testimonies of other officers are

13

relevant to whether a jury could find that [the officer] reacted reasonably for an officer in his position," *Finch v. Rapp*, 38 F.4th 1234, 1242 (10th Cir. 2022). Testimony from civilian eyewitnesses is likewise relevant. *See Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020) ("[T]he multiple eyewitnesses who did not see Mr. Smart holding a gun (particularly Ms. James, who was standing only a few feet from Mr. Smart), . . . creat[e] a dispute of fact as to whether Mr. Smart had a gun on the night of the shooting."); *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (considering eyewitness testimony to determine whether a constitutional violation occurred).

The district court did not legally err by considering testimony from all of the witnesses en route to its factual determinations. We therefore lack jurisdiction to review any of the district court's factual determinations under the legal error exception.

## B. *Qualified Immunity*

When the district court denied the officers' summary judgment motion seeking qualified immunity, it held a reasonable jury could find that both Officer Lewis and Officer Pitts used excessive force in violation of clearly established Fourth Amendment law. *Burke*, 2024 WL 4508959 at *15. The officers challenge this ruling. We affirm.

"We review the district court's denial of a summary-judgment motion asserting qualified immunity de novo." *Flores v. Henderson*, 101 F.4th 1185, 1192 (10th Cir. 2024) (quoting *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023)).

14

"[W]e thus consider de novo the purely legal questions of [(1)] whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation and [(2)] whether that law was clearly established at the time of the alleged violation." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) (quotations omitted). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Section 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 101 F.4th at 1192-93 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

When a § 1983 defendant asserts qualified immunity, the burden shifts to the plaintiff to show "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (quoting *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013)). We have discretion to "consider the two parts of this test in the sequence we deem best 'in light of the circumstances in the particular case at hand.'"

15

*Id.* at 412 (quoting *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009)). "The court must grant the defendant qualified immunity if the plaintiff fails to prove either prong." *Flores*, 101 F.4th at 1193 (quoting *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022)).

## 1. Constitutional Violation

### a. *Excessive force*

To establish an excessive force Fourth Amendment constitutional violation, "the plaintiff must demonstrate the force used was objectively unreasonable." *Taylor*, 16 F.4th at 759.[8] "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quotations omitted). Courts evaluate reasonableness under the totality of the circumstances based on the *Graham* factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "[T]he situation at the precise time of the shooting will often be what matters most; . . . [b]ut earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Barnes v. Felix*, 605 U.S. 73, 80 (2025).

---

[8] The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 650, 655 (1961).

The "second *Graham* factor 'is undoubtedly the "most important" . . . factor in determining the objective reasonableness of an officer's use of force.'" *Teetz*, 142 F.4th at 723 (quoting *Pauly*, 874 F.3d at 1216). To evaluate that factor in a deadly force case, we consider the *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008), subfactors: (1) whether the officers ordered the suspect to drop his weapon and whether the suspect complied with the order, (2) hostile motions made with the weapon toward the officer, (3) the distance separating the officer and the suspect, and (4) the manifest intentions of the suspect. *Id*. at 1260. A reasonable, but mistaken, belief that a suspect posed an immediate threat may justify more force than in fact was needed. *See id*.

"[O]ur cases instruct us that in assessing the second *Graham* factor, we must also consider whether an officer's 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Flores*, 101 F.4th at 1194 (quoting *Arnold*, 35 F.4th at 789); *see also Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). Recklessness is indicated by "police onslaught at the victim." *Arnold*, 35 F.4th at 789 (quoting *Valverde*, 967 F.3d at 1067). We also consider "the amount of time between the officer's actions and the use of force." *Id.* at 790.

b. *Analysis*

Applying the *Graham* and *Larsen* factors, the district court concluded a reasonable jury could find Officer Lewis's tasing and Officer Pitts's shooting were not objectively reasonable. *See Burke*, 2024 WL 4508959, at *16-21. In challenging that conclusion, the officers continue to press factual arguments, which we lack

17

jurisdiction to consider. They also argue the district court erred in applying the objective reasonableness standard to the facts. We disagree. Finally, they have waived any remaining legal challenge under the *Graham* and *Larsen* factors.

       i.   <u>Factual arguments</u>

On appeal, the officers label their arguments as abstract legal challenges, Aplt. Br. at 15-33, but some of them "depend on facts that differ from those the district court held a reasonable jury could find," which we lack jurisdiction to consider, *Vette*, 989 F.3d at 1167. They claim the district court's conclusion that Thomas did not pose an immediate threat was a "misapplication of the Fourth Amendment" because Thomas was coming towards Officer Pitts and "made a rapid motion with his right hand coming up from his right waist band holding a black object." *Id.* at 20-21, 26-28. But the district court said a reasonable jury could find otherwise. *Burke*, 2024 WL 4508959, at *18-19. "[W]e are bound by the district court's factual findings" and lack jurisdiction to entertain the officer's arguments premised on factual attacks. *Clerkley*, 121 F.4th at 1365; *Vette*, 989 F.3d at 1167 ("Because his arguments challenge the district court's factual findings, rather than present pure questions of law, they fall outside the parameters of our collateral-order jurisdiction."); *Sawyers*, 962 F.3d at 1284 ("Because the officers dispute the court's factual conclusions, we lack jurisdiction to consider this argument.").

       ii.   <u>Legal arguments</u>

The officers argue the district court erred in applying the objective reasonableness standard by (1) failing to consider whether Officer Pitts's mistaken

belief that Thomas was coming towards her with a gun was nonetheless reasonable;

(2) overlooking significant facts when evaluating the totality of the circumstances;

and (3) concluding the officers recklessly created the need for force.[9]

(1)  Reasonable mistaken belief

Accepting the district court's determination that a reasonable jury could find

that Thomas was "merely trying to exit the bedroom and that he was unarmed," the

officers urge that Officer Pitts's mistaken belief—that Thomas was coming towards

her with a gun—was reasonable. *Id.* at 14, 16-17.

Qualified immunity shields officers who make reasonable mistakes. *Heien v.*

*North Carolina*, 574 U.S. 54, 66 (2014).  The objective reasonableness calculus

accounts for "the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation." *Tenorio v. Pitzer*,

802 F.3d 1160, 1164 (10th Cir. 2015) (quoting *Graham*, 490 U.S. at 396-97).  But, as

previously discussed, objective reasonableness does not turn on Officer Pitts's

subjective belief that Thomas had a gun.  "We do not examine the subjective

understanding of the particular officer involved." *Heien*, 574 U.S. at 66.  The

"inquiry is always . . . from the perspective of a reasonable officer on the scene."

*Pauly*, 874 F.3d at 1215 (quoting *Larsen*, 511 F.3d at 1260).

---

[9] The first two arguments solely concern Officer Pitts and the shooting.  The third argument concerns both officers.

"The salient question is whether [Officer Pitts's] mistaken perception[] that [Thomas] was about to use a firearm w[as] reasonable." *Taylor*, 16 F.4th at 764-65 (quotations omitted and alterations adopted). We cannot say it was in light of the district court's factual determinations. The district court said a reasonable jury could find that:

- Willis told the officers "that Thomas was unarmed—but warned them that Thomas keeps making furtive movements towards his back pocket." *Burke*, 2024 WL 4508959, at *13.

- During the "skirmish" in the bedroom, Thomas "pushed [Officer Lewis] away" and walked "towards the bedroom door" while "mov[ing] his hand towards his back pocket." *Id.*

- Thomas was not holding a weapon or a black object when he was shot (and was possibly holding nothing at all). *Id.* at *10, *17-18.[10]

---

[10] The district court relied on Willis's and Officer Lewis's deposition testimony to conclude it was disputed what "(if anything)" Thomas was holding when he was shot. *Burke*, 2024 WL 4508959, at *10, *13, *18.

Willis testified that Thomas was not holding anything in the bedroom: Q. "Was there anything in either of his hands in that bedroom? A. No. When I seen his arm come up, it was when he was trying to get around the officer." App., Vol. II at 376. When asked about the black television remote, he testified that it was not in Thomas's hand— "If it was in his hand I would have seen. His hand was right up in front of my face—." *Id.* at 384.

Officer Lewis testified, "I don't see him holding anything, but I see him doing [a hand motion]. And then I hear a gunshot." *Id.* at 356. Also, "Q. All right. You said that you did not see anything in Thomas's hands at the time that Officer—then-Officer Pitts first discharged her weapon; correct? A. At the time of him doing this motion, I could not discern anything in his hands." *Id.* at 358-59. He later testified that "when [Thomas] fell to the ground, I saw that he had a black TV remote in his hand." *Id.* at 361. But when asked if he saw the TV remote in Thomas's right hand, Officer Lewis clarified "it had fallen from his hand, yes." *Id.* In a declaration submitted a year after his deposition, Officer Lewis changed course: "I saw a black object in Thomas Gay's right hand just before Officer Pitts fired her gun." App., Vol. I at 89. The district court said

20

Based on these facts, the district court concluded that "the evidence does not support the notion that Thomas drew and pointed [an] object like one would draw and point a gun," *id.* at *18-19 (quotations omitted). It concluded that Officer Pitts's mistaken belief was not reasonable. *Id.* at *19.

We agree with this conclusion by comparing this case to *Larsen*, a "prototypical case" finding an officer's mistaken threat assessment to be reasonable. 511 F.3d at 1261. There, the officer's mistaken belief supported the use of force because:

> (1) Larsen had already threatened violence against himself and others; (2) the officers responded to an emergency call late at night; (3) when the officers arrived, they encountered a man armed with a knife; (4) both officers repeatedly told Larsen to put down the knife; (5) the knife was a large weapon with a blade over a foot in length rather than a mere pocket knife or razor blade; (6) Larsen refused to cooperate with the officers' repeated orders to drop his weapon; (7) Larsen held the high ground vis-a-vis the officers; (8) Larsen raised the knife blade above his shoulder and pointed the tip towards the officers; (9) Officer Brase was also prepared to use force and was moving into position to be able to do so; (10) Larsen turned and took a step toward Officer Murr; (11) the distance between Murr and Larsen at the time of the shooting, though disputed, was somewhere between 7 and 20 feet.

*Id.* at 1260-61.

---

the inconsistent statements showed a disputed fact. *Burke*, 2024 WL 4508959, at *10 n.18.

By contrast, Officer Pitts's mistaken belief did not support the use of force because:

> (1) Thomas had not threatened violence; (2) the officers responded to domestic disturbance call at 8:00 p.m.; (3) when the officers arrived, they encountered a man holding "an innocuous object (apparently a ventriloquist doll)," *Burke*, 2024 WL 4508959, at *13; (4) "[o]nly one command was given to Thomas at the beginning of the encounter," *id.* at *21; (5) Thomas was not holding a weapon, *id.* at *17; (6) Thomas lacked sufficient time to comply with the sole command, *see Krueger*, --- F.4th ---, 2025 WL 2424209, at *18 (holding "the jury could find he was not given time to comply" when use of force occurred after six seconds); (7) the officers followed Thomas into the bedroom; (8) again, Thomas was not holding a weapon; (9) both officers were prepared to use force; (10) Thomas walked towards the bedroom door; and (11) the officers and Thomas were in close proximity.

The only facts aligning with *Larsen*—that both officers were prepared to use force and were in close proximity to Thomas—do not justify a mistaken belief that Thomas was about to use a firearm or other weapon. Although "drawing a gun to fire at an officer . . . presents a lethal threat when the officer is close by[,] . . . when the suspect is not holding a gun" or other weapon, "officers can do little more than . . . order the suspect to raise his hands and get to the ground." *Valverde*, 967 F.3d at 1061-62. Accepting that Thomas was not holding a weapon or black object (if he was holding anything), we cannot conclude Officer Pitts mistakenly but reasonably believed that Thomas drew a gun to fire at her.[11]

---

[11] In addition to *Larsen*, the officers cite cases for reasonable mistaken belief that are factually distinguishable from this case. *See* Aplt. Br. at 16-19, 25; Aplt. Reply Br. at 2-3.

The district court did not err in concluding that Officer Pitts's mistaken belief that Thomas posed an immediate threat was unreasonable.

---

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010), concerned a police officer who shot at a vehicle after "he had been struck and propelled over the hood" of the car. *Id.* at 666. We said the shooting was reasonable even though the officer was mistaken that the car "was still approaching him." *Id.* Given that "he had just been struck by the [vehicle] and spun around," a "disorienting experience," "he had no assurance that the threat posed by the [vehicle] had passed." *Id.* In *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995), we said it was reasonable for a police officer to shoot a suspect holding a gun, even if the suspect intended to surrender the weapon and did not point it at the officer, because "it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life." *Id.* at 1553. In *Waterhouse v. Direzza*, 129 F.4th 1212 (10th Cir. 2025), we held that shooting the unarmed suspect was reasonable because he confronted the officers in a burning basement, which he had set on fire after "aggressively reject[ing]" the officers' requests to surrender for two hours, and because "a simple physical struggle in that environment could be a matter of life or death. *Id.* at 1223.

The officers' out-of-circuit cases are similarly distinguishable. In *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), the Sixth Circuit held that it was reasonable for an officer to believe a suspect "still had the gun in his hand," even if he had already "throw[n]" it, because "only a few seconds passed between when [the suspect] brandished his firearm and when [the officer] shot [him.]" *Id.* at 767-68. In *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005), the Eleventh Circuit held an officer reasonably believed a suspect was using a car as a deadly weapon when the officer "had, at most, 2.72 seconds to react before getting crushed between" the suspects' car and another vehicle. *Id.* at 1254.

Here, Officer Pitts faced nothing comparable to the circumstances in these cases.

(2)  Overlooked facts

The officers claim the district court overlooked key facts, including (1) the quick duration of the encounter; (2) Thomas's movement away from the officers and into the bedroom; (3) Thomas's rage and continuous motion, despite Officer Lewis having tased him four times; and (4) "Thomas being high on drugs."  Aplt. Br. at 23-26.  But the district court did not overlook these facts.  It expressly considered each one when analyzing the reasonableness of Officer Pitts's force.  It said that "Thomas was suspected of being 'high on drugs or something,'' *Burke*, 2024 WL 4508959, at *16, and "[a]fter being tased, Thomas did not give himself up for arrest. . . .  Instead, he walked backwards.  Went into a bedroom.  Was tased again.  And then he reached towards his back pocket while moving towards Officer Pitts," *id.* at *19.  In the bedroom, "Thomas was in a 'rage.'"  *Id.*  And the court noted the entire encounter lasted 200 seconds.  *Id.*

(3)  Reckless creation

Finally, the officers argue the district court erred in concluding a reasonable jury could find the officers recklessly created the need to use deadly force.[12]  They contend the court improperly relied on the Estate's expert report to reach this conclusion.  Aplt. Br. at 29-33.  The court did not err.

The Estate's expert, Michael D. Lyman, Ph.D., opined that

---

[12] "[B]inding Tenth Circuit precedent requires us to consider whether the officers' alleged reckless conduct created the need to use deadly force."  *Arnold*, 35 F.4th at 790.  This "is simply a specific application of the 'totality of the circumstances' approach

- the officers "failed to conduct a proper and thorough preliminary investigation";

- they "failed to practice proper methods of de-escalation";

- Officer Lewis's taser deployments "were excessive, unnecessary and improper";

- BPD "failed to provide proper training" on taser usage; and

- Officer Pitts's shooting "was improper, excessive and unnecessary."

App., Vol. III at 408-09. In addition to the expert report, the district court cited Officer Pitts's testimony in addressing whether evidence suggested the officers recklessly created the need to use force. *Burke*, 2024 WL 4508959, at *19.

A "district court can and should take into account expert testimony" when "considering summary judgment." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *see Smart*, 951 F.3d at 1175, 1177-78 (considering expert evidence and reversing summary judgment based on qualified immunity); *Booker*, 745 F.3d at 430-31, 436 (considering expert evidence and affirming summary judgment based on qualified immunity).

Other than assert that the Estate's expert report is "speculative and conclusory," Aplt. Br. at 29, the officers do not contest its admissibility. Their objection is based on the notion that "a plaintiff cannot avoid summary judgment" on qualified immunity grounds "by simply producing an expert's report that an officer's behavior leading up to the deadly confrontation was imprudent, inappropriate or even

---

inherent in the Fourth Amendment's reasonableness standard." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001).

reckless." *Id.* (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)). But that did not happen here. To determine whether the officers "escalated, rather than deescalated, the situation," the district court considered the duration of time between the officers' arrival and the taser deployment, the taser deployment after only one command, and the fact that Officer Pitts drew her gun after Officer Lewis discharged the taser. *Burke*, 2024 WL 4508959, at *20. The expert report thus was not the sole evidence behind the district court's decision.

In sum, the officers have not shown the district court legally erred in evaluating whether a reasonable jury could conclude the officers recklessly created the need to use force. *See Allen*, 119 F.3d at 841 ("[A] reasonable jury could conclude on the basis of [differences among the eyewitness depositions] that the officers' actions were reckless and precipitated the need to use deadly force.").

### iii.  Inadequate briefing and waiver

Due to inadequate briefing, the officers have waived any further legal challenge under the *Graham* and *Larsen* factors. *See Sawyers*, 962 F.3d at 1286. "Issues not raised in the opening brief are deemed abandoned or waived." *Id.* (quoting *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004)). This rule "applies equally to arguments that are inadequately presented in an opening brief." *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (quotations omitted). "Consistent with these principles is the general rule that appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply

brief." *Sawyers*, 962 F.3d at 1286 (quoting *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006)).

The officers fail to address the *Graham* or *Larsen* factors in their opening brief. They obliquely reference the second *Graham* factor by challenging the "district court's determination that Thomas was not a threat to Officer Pitts," Aplt. Br. at 27, but, for the reasons discussed, that argument stems from factual disagreements that fall outside our jurisdiction. The officers' passing references to the *Graham* factors without identifying any particular factor, *id.* at 24-25, and their citations only to *Graham*'s overarching objective reasonableness standard, *id.*, are insufficient to press an argument that the district court misapplied any particular *Graham* or *Larsen* factors. In their reply brief, the officers argue the second and third *Graham* factors. Aplt. Reply Br. at 17-18. But issues raised for the first time in a reply brief are deemed waived. *See Sawyers*, 962 F.3d at 1286.

2. **Clearly Established Law**

For the applicable law "[t]o be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, that would have put an objective officer in [the officers'] position on notice that they were violating the decedent's Fourth Amendment rights." *Krueger*, --- F.4th ---, 2025 WL 2424209, at *17 (alterations adopted) (quoting *Vette*, 989 F.3d at 1171). The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). A prior decision must sufficiently address the prohibited

conduct so "that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"Thus, a right is clearly established when our precedent encompasses '"materially similar conduct" or applies "with obvious clarity" to the conduct at issue.'" *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022) (quoting *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017)). In that vein, cases holding less egregious, similar conduct unconstitutional would provide fair warning that more egregious conduct is unlawful. *See McCowan v. Morales*, 945 F.3d 1276, 1286 (10th Cir. 2019) ("[I]f we can find cases holding an officer was not entitled to qualified immunity on a lesser subset of these salient factors, then *a fortiori* those cases too should have advised [defendant] of the illegality of his behavior.").

The officers argue that the district court defined clearly established law at too high a level of generality.[13]

    a. *Officer Lewis's tasing*

The district court relied on *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010); and *Lee v. Tucker*, 904 F.3d 1145 (10th Cir. 2018), to conclude

---

[13] The officers also argue the district court erred by shifting the burden to them on the clearly established law issue, noting the court's comment that they provided "zero factually similar cases" showing their conduct was reasonable. Aplt. Br. at 35-36 (quoting *Burke*, 2024 WL 4508959, at *22). Apart from this passing reference, the court analyzed the cases presented by the Estate, considered the officers' attempt to distinguish them, and concluded the law was clearly established. *Burke*, 2024 WL 4508959, at *22-26. The court appropriately determined the Estate carried its burden.

Officer Lewis's actions violated clearly established law. *Burke*, 2024 WL 4508959, at *25.[14] We agree. *Cavanaugh* and *Lee* establish that "the use of a Taser without warning on a non-resisting misdemeanant violates the Fourth Amendment's excessive force protections." *Lee*, 904 F.3d at 1150.

In *Cavanaugh*, three officers "responded to a non-emergency call" from a man "request[ing] help finding his wife," who had "consumed alcohol and pain medication" and "stormed out of the house" with a kitchen knife following a "domestic dispute." 625 F.3d at 662-63. A neighbor witnessed "Ms. Cavanaugh walking down the sidewalk towards her home" and "saw that she was not holding a knife." *Id.* at 663. As Ms. Cavanaugh "walked quickly, but did not run" towards her front door, an officer "followed her, no more than six feet behind," and then "discharged the Taser into Ms. Cavanaugh's back without warning." *Id.* We held the officer's actions "were objectively unreasonable and violated the Fourth Amendment." *Id.* at 664. Ms. Cavanaugh was suspected of at most a minor crime, did not pose an immediate threat to the officer or anyone else, and was "neither actively resisting nor fleeing arrest." *Id.* at 665. The officer's decision to tase Ms. Cavanaugh without "any warning—or of facts making clear that no warning was necessary—" was "especially troubling." *Id.* (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)).

---

[14] The district court also cited *Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007). Because *Cavanaugh* and *Lee* sufficiently place a reasonable officer in Officer Lewis's position on notice that "his conduct was unlawful in the situation he confronted," *see Bond*, 595 U.S. at 12 (quotations omitted), we need not address *Casey*.

In *Lee*, officers responded to a 911 call from a woman reporting that "her husband had been drinking and they had been fighting." 904 F.3d at 1147. Upon arrival, the officers separated the spouses and placed Mr. Lee in the living room. *Id.* Mr. Lee "swore at [the officer] . . . , stood up from the sofa and moved toward the kitchen." *Id.* at 1147-48. As Mr. Lee moved toward the kitchen, the officer attempted to detain him "due to the perceived risk of harm present from the knives in the kitchen" and a "struggle broke out." *Id.* at 1148. The officer "drew his Taser and applied it three to five times to Lee's back, with each application lasting approximately three, five, and eight seconds respectively." *Id.* The officers had not "advised Lee that he was being detained and was not free to move about the house." *Id.* at 1150. Based on *Cavanaugh*, we held it was clearly established that "the use of a Taser without warning on a non-resisting misdemeanant violates the Fourth Amendment's excessive force protections." *Id.*

In this case, the facts a reasonable jury could find are "materially similar" to those in *Cavanaugh* and *Lee*. *Shepherd*, 55 F.4th at 815 (quotations omitted). The officers responded to a non-emergency domestic disturbance. *Burke*, 2024 WL 4508959, at *13. They knew Thomas was possibly under the influence of drugs. *Id.* They did not advise Thomas that he was under arrest and not free to move about the house. *Id.* at *13, *21. Thomas did not make any hostile or threatening motions toward the officers but moved toward another part of the house. *Id.* at *13, *17. After a single command to drop the "innocuous object (apparently a ventriloquist

doll)" that Thomas was holding in the living room, and without any warning, Officer Lewis deployed the taser multiple times. *Id.* at \*6, \*13.

Officer Lewis's conduct was more egregious than the conduct found unlawful in *Cavanaugh* and *Lee*. In those cases, the officers had a particularized belief that the suspect had or could obtain a weapon, and the 911 calls reported a physical altercation. Ms. Cavanaugh's husband reported that she had "attempted to put him in a closet" and left the house with a knife. 625 F.3d at 663. And Mr. Lee's wife reported "he had pinned her to the ground and shoved her" and the officer was concerned about "the knives in the kitchen." 904 F.3d at 1147-48. In contrast, Willis had not reported any physical altercation and had informed the officers that Thomas was unarmed. *Burke*, 2024 WL 4508959, at \*13.

The officers' attempts to distinguish *Cavanaugh* and *Lee* "amount to further impermissible challenges to the district court's factual recitation." *Lee*, 904 F.3d at 1150. They assert that, unlike in those cases, "[t]he evidence demonstrates that Officer Lewis gave several commands to Thomas." Aplt. Br. at 45. But the district court found the number of commands disputed and that a reasonable jury could find Officer Lewis gave only one command—asking Thomas to drop the "object, (apparently a ventriloquist doll)" that he was holding—before deploying his taser. *Burke*, 2024 WL 4508959, at \*6, \*13. The officers did not challenge the single-command finding under any exception to the scope of our interlocutory

31

jurisdiction. *See* Aplt. Br. at 10-33. The officers' factual arguments remain beyond our jurisdiction. *Lee*, 904 F.3d at 1150.[15]

In sum, Officer Lewis violated the law clearly established by *Cavanaugh* and *Lee* "by repeatedly applying a Taser without warning, despite the fact that [Thomas] was not resisting the officers and had not been advised that he was being detained." *Id.*

### b. *Officer Pitts's shooting*

The district court held it was clearly established that "an officer cannot shoot an unarmed man who does not pose any actual threat" under *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished); *Allen v. Muskogee*; *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010); *King v. Hill*, 615 F. App'x 470 (10th Cir. 2015) (unpublished); *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989); *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013); and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). *Burke*, 2024 WL 4508959, at *22-26.

---

[15] Even if the officers accepted the district court's factual determinations and argued Officer Lewis's single command sufficiently distinguishes the cases, they would fail. Here, as in *Cavanaugh* and *Lee*, there was no taser warning. *Lee* emphasized the lack of warning, explaining an order "does not shield defendants from clearly established law that requires a warning prior to the use of force under circumstances involving a 'nonviolent misdemeanant who [does not] pose a threat and [is not] resisting or evading arrest.'" *Id.* at 1150 n.2 (alterations in original) (quoting *Cavanaugh*, 625 F.3d at 667).

The officers argue that unpublished decisions from this court cannot clearly establish law. We agree and do not consider them.[16] Leaving aside the unpublished cases, we agree with the district court that Thomas's constitutional right to be free from deadly force in these circumstances was clearly established in June 2019. Shooting a suspected misdemeanant who was moving but not holding a weapon and who did not pose an immediate threat violates the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1 (1985), provides that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11.

Beyond *Garner*'s general principle, *Ceballos*, 919 F.3d at 1216-17; *Tenorio*, 802 F.3d at 1161-66; and *Carr*, 337 F.3d at 1224-28 concerned "materially similar conduct or appl[y] with obvious clarity to the conduct at issue." *Shepherd*, 55 F.4th at 815 (quotations omitted).[17] These cases clearly established that Officer Pitts's conduct violated Thomas's Fourth Amendment rights.

---

[16] *See Green v. Post*, 574 F.3d 1294, 1305 n.10 (10th Cir. 2009) ("In determining whether the law was clearly established, we have held that we may not rely upon unpublished decisions."); *see also White v. Lucero*, 135 F.4th 1213, 1220 (10th Cir. 2025) ("[U]npublished cases 'provide little support for the notion that the law is clearly established." (quoting *Knopf v. Williams*, 884 F.3d 939, 947 (10th Cir. 2018)).

[17] The Estate did not rely on *Tenorio* or *Carr* in its briefs but raised *Carr* during oral argument. *See* Oral Arg. at 36:40-37:11. The district court cited *Carr* for the general proposition that "Thomas' constitutional right to be free from deadly force was clearly established," but did not discuss the case in detail. *Burke*, 2024 WL 4508959, at *22. "[W]e are not restricted to the cases cited by" the Estate. *Cortez v. McCauley*, 478 F.3d 1108, 1122 n.19 (10th Cir. 2007) (en banc). "[O]nce the plaintiffs urged a clearly established right . . . , we incurred an obligation to conduct our own legal research to determine the clarity of a constitutional violation." *Love*, 134 F.4th at 1117; *see also Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("A court engaging in review of a qualified

In *Ceballos*, we held an officer violated clearly established law when he "shot and killed an emotionally distraught [suspect] within a minute of arriving on scene." 919 F.3d at 1216. The officer responded to a call from a woman stating her husband was "drunk and probably on drugs" and armed with a bat in the driveway of their home. *Id.* at 1208-09. The officers also received information that the suspect was "known to have knives." *Id.* at 1209 (quotations omitted). At the house, the officers "repeatedly shouted commands for [the suspect] to drop the bat," but he started walking towards the officers instead and responded with expletive refusals. *Id.* at 1210. After less than a minute, one of the officers shot and killed the suspect. *Id.* at 1211. We said it was clearly established that "provoking a fatal encounter" when the officer knew that a suspect's "capacity to reason was diminished, whatever the underlying reason might have been—mental health problems, emotional distress, drunkenness, or drugs"—by approaching the suspect quickly, screaming commands, and "refusing to give ground" violated the Fourth Amendment. *Id* at 1216-17.

Here, Officer Pitts similarly responded to a domestic disturbance call reporting that a family member was likely on drugs. *Burke*, 2024 WL 4508959, at *13. From Thomas's appearance and conduct, she knew of his diminished reasoning capacity. *Id.* at *5-6. But Officer Pitts "did not attempt to talk to Thomas" or "try and calm him down." *Id.* at *23. Instead, she "drew [her] weapon[] immediately and cornered

---

immunity judgment should therefore use its full knowledge of its own [and other relevant] precedents." (alteration in original) (quotations omitted)).

Thomas in his bedroom." *Id.* at *24. In *Ceballos*, the officers' conduct was unconstitutional even though the suspect started walking towards the officers with a bat. It follows that Officer Pitts's conduct would be unconstitutional given that Thomas moved towards the bedroom door without any weapon or black object in his hands. *Id.*

In *Tenorio*, we affirmed the denial of a summary judgment motion seeking qualified immunity because the evidence supported a violation of clearly established law. 802 F.3d at 1161. Officers responded to a call from a woman reporting that her "sister-in-law's husband, later identified as [Mr.] Tenorio, was intoxicated and holding a knife to his own throat" and she was "afraid that [Mr.] Tenorio would hurt himself or his wife." *Id.* at 1161-62. The officers were also informed that Mr. Tenorio had been violent in the past. *Id.* at 1162. When the officers entered the house, they encountered Mr. Tenorio "who had a blank stare and was carrying a . . . kitchen knife." *Id.* at 1163. He "walked forward into the living room at an average speed." *Id.* (quotations omitted). An officer yelled at him to put the knife down multiple times before shooting him. *Id.* "The time between the first officer's arrival and the shooting was less than four minutes." *Id.* We held it was clearly established where a suspect was holding only a knife, not a gun, was not charging the officer, and made no aggressive move toward the officers with his knife, that "it was unreasonable for the officer to use deadly force against the suspect." *Id.* at 1165-66 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006)).

*Tenorio* would put a reasonable officer on notice that using deadly force against an unarmed individual moving towards a bedroom door is unconstitutional. The district court determined a reasonable jury could find Thomas did not make any hostile motions with a weapon and was walking towards the bedroom door when Officer Pitts shot him. *Burke*, 2024 WL 4508959, at *17-18. As in *Tenorio*, the short duration does not immunize the shooting, especially when Officer Pitts "immediately (or nearly instantaneously) drew . . . [her] firearm" without identifying herself as a police officer or telling Thomas that "he was not free to move about the house" and "what [she] wanted him to do." *Id.* at *23, 25.

In *Carr*, we affirmed the district court's denial of summary judgment based on qualified immunity. Officers responded to a call from Mr. Carr's landlord reporting that Mr. Carr had struck him several times. 337 F.3d at 1224. When they encountered Mr. Carr, he was "acting very excited and aggressive" and struck one officer in the head and kicked another in the groin when they attempted to handcuff him. *Id.* at 1225. Mr. Carr then ran, and the officers gave chase. *Id.* During the chase, Mr. Carr emerged from a hiding place and moved towards one of the officers, who deployed pepper spray. *Id.* Mr. Carr picked up a four-inch piece of concrete. *Id.* When Mr. Carr came to a fence that he could not climb, he "ran toward [an officer] while raising his arm to throw the concrete at [the officer]." *Id.* According to a witness, after Mr. Carr finished throwing the concrete, the officers shot and killed him. *Id.* On appeal, the officers argued that "the use of deadly force against an individual who is running at an officer armed with a piece of concrete is not

36

unconstitutional." *Id.* at 1227 (quotations omitted). We held that argument failed because a witness testified the concrete had left Mr. Carr's hand before the officers fired and forensic evidence showed Mr. Carr was shot in the back. *Id.* Viewing the facts "from the required pro-Carr stance," we affirmed the district court's determination that the officers' conduct violated the constitutional right clearly established in *Garner*. *Id.* at 1227-28.

Based on the district court's determination of facts, a reasonable jury could find that Officer Pitts shot Thomas when he moved towards the bedroom door and made a motion with his right hand. *Burke*, 2024 WL 4508959, at *13. *Carr* confirms this conduct violated the Fourth Amendment. Even though Mr. Carr "ran toward [an officer] while raising his arm to throw" an object, shooting him was unconstitutional because the purported weapon—a piece of concrete—had left his hand. 337 F.3d at 1225, 1227-28. *Carr* clearly establishes that an officer may not shoot an unarmed, moving suspect.

In sum, it would be a clearly established Fourth Amendment violation for Officer Pitts to corner and shoot a moving but unarmed and unthreatening suspect who was under the influence of drugs.

## III. CONCLUSION

We affirm the district court's denial of summary judgment to Officer Lewis and Officer Pitts.

37